O'MELVENY & MYERS LLP
Attorneys for Debtors and Debtors in Possession/
    Plaintiff
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
Adam C. Harris, Esq. (AH 4641)
Dale M. Cendali, Esq. (DC 2676)

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re<br><br>LIONEL L.L.C., <u>et al.</u>,<br><br>             Debtors. | Index No. Chapter 11 Case No: 04-17324 (BRL)<br><br>(Jointly Administered) |
| Lionel L.L.C.,<br><br>             Plaintiff,<br><br>        -against-<br><br>K-Line Electric Trains, Inc., MDK Inc., Maury Klein and Robert Grubba,<br><br>             Defendants. | Case No.<br><br>**COMPLAINT** |

Plaintiff, Lionel L.L.C. ("Plaintiff" or "Lionel"), by and through its counsel,

O'Melveny & Myers LLP, for its Complaint against K-Line Electric Trains Inc. and MDK Inc.

d/b/a K-Line (together "K-Line"), Maury Klein ("Klein") and Robert Grubba ("Grubba"),

(collectively "Defendants"), states as follows:

<u>**THE NATURE OF THE ACTION**</u>

1.      This action arises out of the defendants' deliberate misappropriation of Lionel's

trade secrets, defendants' infringement of Lionel's copyright, defendant Grubba's breach of

contract, defendants K-Line and Klein's tortious interference with Grubba's contractual relations

with Lionel, defendants' tortious interference with Lionel's contractual relations with its most senior engineer, Marty Pierson ("Pierson").

2. Both Lionel and K-Line design, manufacture and market electric model trains and accessories. Lionel is the acknowledged industry leader with a sterling reputation for cutting edge engineering, high quality products and excellent customer service. Lionel has earned and maintained this reputation by, among other things, devoting much of its resources to research and development.

3. Lionel developed four state-of-the-art technologies that have given it a considerable competitive edge. Lionel licensed one of these technologies to its competitors, but carefully preserved the confidentiality of the other three.

4. K-Line and Klein through Grubba, a former Lionel employee now working for K-Line, bribed Pierson to (i) transfer Lionel's technology to K-Line and (ii) design and develop superior versions of the secret Lionel technologies for K-Line.

5. K-Line then started to market products containing Lionel's confidential and proprietary technology at prices considerably lower than Lionel's.

6. Lionel seeks (i) to enjoin K-Line, Klein and Grubba from using Lionel's trade secrets and copyrights in its products, including a recall (ii) damages against K-Line, Klein and Grubba for misappropriating Lionel's trade secrets and infringing Lionel's copyright, (iii) damages against Grubba for breach of contract, (iv) damages against K-Line and Klein for tortiously interfering with Lionel's contractual relations with Grubba, (v) damages against K-Line, Klein and Grubba for tortiously interfering with Lionel's contractual relationship with Pierson and (vi) damages against K-Line, Klein and Grubba for conspiracy with Pierson for misappropriation of trade secrets.

## THE PARTIES

7.     Plaintiff Lionel is a New York limited liability company with its principal place of business at 26750 23 Mile Road, Chesterfield, Michigan 48051. Lionel is, and at all times material herein, was engaged in the business of designing, developing, manufacturing and marketing model trains and model train accessories.

8.     Defendant K-Line Electric Trains is a North Carolina corporation, with its principal place of business at 6909 Dodson's Crossroads, Hillsborough, NC 27278. Upon information and belief, K-Line Electric Trains is, and at all times material herein, was engaged in the business of designing, developing, manufacturing and marketing model trains and model train accessories.

9.     Defendant MDK Inc. is a North Carolina corporation, with its principal place of business at 6909 Dodson's Crossroads, Hillsborough, NC 27278. Upon information and belief, MDK Inc. is, and at all times material herein, was engaged in the business of designing, developing, manufacturing and marketing model trains and model train accessories, and MDK does business as K-Line Electric Trains.

10.     Defendant Grubba is an individual, who, upon information and belief resides in Ormond Beach, Florida. Grubba, a former executive and consultant with Lionel, is now employed by K-Line.

11.     Defendant Klein is an individual, who, upon information and belief resides in North Carolina. Upon information and belief Klein is the CEO of K-Line and owns 100% of its shares.

## JURISDICTION AND VENUE

12.     On November 15, 2004 Lionel filed for bankruptcy in the Southern District of New York under Chapter 11 of Title 11 of the United States Code. Accordingly, this Court has jurisdiction over these claims pursuant to 28 U.S.C. 157(b). This matter is a core proceeding.

13. This Court has personal jurisdiction over defendant K-Line because it conducts continuous, systematic and routine business within the State of New York.

14. This Court has personal jurisdiction over defendant Klein because, because upon information and belief, he conducts continuous, systematic and routine business within the State of New York.

15. This Court has personal jurisdiction over defendant Grubba, because, upon information and belief, he conducts continuous, systematic and routine business within the State of New York.

16. Venue is proper in this district under 28 U.S.C. § 1409(a).

## FACTS

### The Nature Of Lionel's Business

17. For over a century, Lionel has designed, manufactured and marketed electric model trains including locomotives, rolling stock, track, electric power transformers and other accessories.

18. The model train market is small, specialized and competitive. Model trains are purchased, for the most part, by collectors, hobbyists and train enthusiasts.

19. The typical customer of model trains is attracted to technological innovations. Therefore the more cutting edge a company's technology, the more successful its business.

20. Lionel is the Nation's Number 1 model train manufacturer. Its success is due, in large measure, to its superior technology. Lionel is committed to research and development and invests much of its resources in developing new technologies.

### The Misappropriated Lionel Technology

21. Lionel has developed three state of the art technologies that have played a large role in Lionel's success. They are (i) a closed-loop speed control system, (known as Odyssey $^{TM}$) that allows a model locomotive to maintain a constant speed regardless of the slope of the

4

track (for example, whether the train is traveling up hill or down hill), (ii) train sound effects technology (called "TrainSounds") which provides economical but very high quality sound for entry level trains and accessories and (iii) an 80-watt dual output transformer that serves as an economical power source for entry level train sets and relatively small operating layouts ("CW-80") (collectively referred to herein as the "Lionel Technology").

### (I) Odyssey $^{TM}$ Speed Control System

22.     Lionel's high-end trains are operated by a highly-sophisticated remote control system called the TrainMaster Command Control System ("TMCC"). Until a few years ago, the TMCC worked only with an open-loop speed control system. Open-loop systems adjust the power to the train's motor and therefore its speed according to the speed selected by the user on the remote control. But the open loop speed system cannot monitor the actual speed of the train, so the speed can change according to the track's slope. For example, when the train was climbing a hill, the train will run slower than the set speed, and if the train was descending, it would go faster. Generally, the ability to maintain a constant speed is an important feature that the open-loop control system lacked.

23.     In or around 1997, Lionel began to invest a significant amount of money and manpower to find a solution that would allow constant speed. By 2000, Lionel had developed a "closed-loop" speed control system, which it called Odyssey $^{TM}$. Unlike the open-loop system, Odyssey $^{TM}$ monitors the real time speed of the train and continuously adjusts the power to its motor so that it maintains a set speed over varying track conditions. Odyssey $^{TM}$ allows a user to select from 32 different speed settings.

24.     The hardware and software of Odyssey $^{TM}$ were implemented in Lionel model trains through a circuit board known as DCDRS.

25.     Odyssey $^{TM}$ was a technological breakthrough. It was first released into production in 2000 and was an instant hit with train enthusiasts. As such, Odyssey $^{TM}$ gave

5

Lionel an enormous competitive advantage. It has become staple feature in Lionel's locomotives, which are the cornerstone of Lionel's product line and contribute significantly to profits. Odyssey $^{TM}$ is contained in all Lionel's high-end locomotives, which high-end generally means engines with an individual suggested retail price in excess of $500. The locomotives are by far the most important component of a model train system, sometimes selling for upwards of $1000.

26.     Odyssey $^{TM}$ does more than just contribute to Lionel's profits however. It helps burnish Lionel's reputation as the manufacturer with the most technologically advanced products. It is technology such as this that has won for Lionel its long-held reputation as the most exciting innovator in the model train business.

### (II) The "TrainSounds" Sound Effects Technology

27.     Realistic sound effects are an important part of a model train set and much beloved by train enthusiasts. Lionel developed a sound effects system called "TrainSounds" for its less expensive trains. TrainSounds is capable of playing engine sounds as well as some other types of background sounds. It also has volume control capability. The TrainSounds technology was released into production in 2003. Some of Lionel's most successful products contain the TrainSounds technology, which provides very high quality sound for entry level trains and accessories.

### (III) The CW-80 Transformer

28.     As a less expensive alternative to the TMCC remote control device, Lionel markets an 80-watt dual output transformer known as CW-80. CW-80 is a powerful and versatile device. CW-80 allows a user to fine tune the level of power not just to the train to control its speed but also to the accessories, such as lights and sounds. With a series of button presses, a user is able to set the power at different levels for the different accessories (to set the brightness of the lights, for example), and to maintain the power at the set level. CW-80 also

resolved the problem of power overload to the tracks, which previously caused the trains to come to a grinding halt. CW-80 continues to provide power to the track during an overload but lowers it to 80 watts, so the trains can continue moving, albeit slowly.

29.    This makes it almost as good as the TMCC models, but at a much lower cost to the consumer. CW-80 was released into production in 2002 and helped Lionel regain market share that it had been losing. Lionel's starter sets, which include the CW-80, constitute a large portion Lionel's sales. The vast majority of starter sets are sold through at retail during the fourth quarter holiday season.

30.    Lionel also sells CW-80 as a separate item. CW-80 was designed so that it would be compatible with Lionel's products as well as most of those of its competitors. Its versatility and flexibility have made it very popular. As with Odyssey ™ and TrainSounds, CW-80 was the product of costly and painstaking research and development efforts.

**Pierson and Grubba Had Full Access to Lionel's Trade Secrets and Copyrights**

31.    From 1997-2005, Lionel employed Marty Pierson as a senior electrical engineer.

32.    From 1997-2001 Grubba was employed by Lionel as Director of Engineering. In that capacity he was Pierson's direct supervisor.

33.    Pierson's responsibilities at Lionel included designing, developing and implementing technology for Lionel. In the approximately eight years that Pierson was employed by Lionel, he became the most senior electrical engineer in charge of research and development and in that capacity was privy to virtually all of Lionel's technical trade secrets. He contributed greatly to the design and development of Odyssey ™, TrainSounds and the CW-80.

34.    It was Pierson, working under Grubba's supervision, who was largely responsible for the design and development of Odyssey ™. He designed Odyssey ™ hardware and initial software (although other Lionel engineers played a role in the subsequent software design). The development of the Odyssey ™ technology took place from 1997 to 2000.

35. It was Pierson who started working on the TrainSounds technology in 2002 until it was released. Grubba was a consultant to Lionel during this period.

36. It was also Pierson who, starting in approximately 2001, designed the circuit and software for CW-80 till its release in 2002. Grubba was a consultant for Lionel during this period as well.

37. Grubba had direct access to Lionel's confidential technology. As Pierson's direct report, he was well aware of what Pierson was doing at Lionel and also knew of Pierson's abilities as an engineer.

**The Measures Lionel Took to Keep the Lionel Technology Secret**

38. As employees with access to Lionel's technological information and involved in Lionel's ongoing research and development, Pierson and Grubba were both under contractual obligations to maintain the strictest secrecy with respect to Lionel's confidential and proprietary information.

39. Pierson and Grubba executed identical employment agreements. The employment agreements contained the following pertinent provisions:

- The Employer shall exclusively devote his/her full time and effort to the Company.

- The Employee agrees not to disclose or use, except in connection with his/her employment hereunder by the Company, any secret or proprietary or confidential information or knowledge acquired by him/her as an Employee of the company, until such information becomes public information other than by virtue of a breach of this paragraph.

- Any inventions, improvements, processes or patent rights developed or discovered by the Employee during his/her employment related to the business of the company shall be fully disclosed by the Employee to the Company, and such item shall become the sole and absolute property of the Company without any further action by the Employee.

- The Employee recognizes that a breach or threatened breach of this section four (4), may give rise to irreparable injury to the Company and therefore agrees that the Company may seek and obtain injunctive

relief against such breach or threatened breach, in addition to any other legal remedies which may be available to the Company.

40.     In addition to the provisions set forth above, the employment agreements defined a "conflict of interest" as "Misuse of information to which the Employee has access by reason of his/her position, such as the disclosure of confidential information to competitors or others outside the business." In the event of any question of such a conflict of interest, Pierson and Grubba were required to disclose the situation in writing to Lionel.

41.     Lionel also required Pierson and Grubba to execute nondisclosure agreements. The two nondisclosure agreements are also identical. They provide in pertinent part:

- Any and all improvements and/or inventions which Employee has conceived or first actually reduced to practice and/or may conceive or first actually reduce to practice during the period of Employee's employment which relate to business of the nature now or hereinafter carried on or contemplated by Employer during the period of Employee's employment shall be the sole and exclusive property of Employer or its nominee . . . .

- Employee shall not directly or indirectly disclose or use at any time either during or subsequent to the said employment any secret or confidential information, knowledge or data of Employer (whether or not obtained, acquired or developed by Employee) unless he shall first secure the written consent of Employer.

42.     Indeed, Lionel regarded the confidential nature of its technology to be so important to its business that even prospective employees were required to acknowledge on their application forms that they would maintain the secrecy of Lionel's confidential information if hired by Lionel. The application form that both Pierson and Grubba filled out (again identical in both cases) provide in pertinent part as follows:

I will hold in the strictest confidence and will not disclose directly or indirectly to any unauthorized persons, without the Company's prior written permission, at any time during or subsequent to my employment, any knowledge not already available to the public, respecting the inventions or respecting designs, methods, systems, improvements, trade secrets, manufacturing techniques and processes, sales promotions and ideas, customer lists or other confidential matters of the Company. I agree to execute an

agreement relating to inventions, secret processes, etc. covering discoveries in the fields of company interest made by me during the period of my employment, at my employer's request.

43.     Grubba left Lionel for K-Line in 2001. But Lionel retained him as a consultant, in aid of litigation in which Lionel was involved at that time. For purposes of his consultancy, Grubba was required to sign a consulting agreement that provided in pertinent part:

The Consultant agrees that he will not at any time (whether during the Term or after termination of this Agreement), disclose to anyone any confidential information or trade secret of the Company . . . or utilize such confidential information or trade secret for his own benefit, or for the benefit of third parties.

44.     The consultancy was terminated in June 2004, when Lionel no longer needed Grubba's services.

45.     Lionel thus took all reasonable measures to ensure that its employees, both past and present, maintain the strictest confidentiality at all times with respect to Lionel's proprietary technology.

## The Measures Lionel Took to Keep Its Technology Secret From Its Competitors

46.     In early 2001, Lionel licensed its TMCC (remote control) technology to several competitors, including K-Line. The licensed TMCC circuit board also contained an older, less sophisticated sound effects technology and the old open-loop speed control technology. The technology was licensed as an integrated, full-featured set and the licensees were obligated to use the circuit board set as such. The licensees were not permitted to manufacture counterfeit circuit boards, modify the circuit board or use component parts of the circuit board separately.

47.     Lionel did not license Odyssey [TM], TrainSounds, or the CW-80 to any of its competitors. Indeed, by licensing the TMCC technology (itself a state-of the-art technological device) combined with the older generation Lionel technology, Lionel ensured that its TMCC system would not be used in conjunction with more sophisticated technology (such as closed-loop speed control technology) even if a licensee succeeded in developing such technology for

itself. In other words, if able to acquire it lawfully, a licensee could use more sophisticated technology, but Lionel did not permit any licensee to use such technology in combination with Lionel's proprietary TMCC technology. To preserve its own intellectual property, Lionel required the TMCC licensee to limit its use to the package that Lionel provided, and was not free to use Lionel's technology in any other system or with other technology.

48.     Lionel believed that these measures were essential to protect its unique combination of technologies and its pre-eminent market position.

### K-Line Markets Locomotives with Closed-Loop Speed Control Technology

49.     K-Line demonstrated a closed loop speed control system at the October 2003 train show in York, Pennsylvania and began to catalog it in it's 2004 Volume 1 catalog under the name "Cruise Control." The features of Cruise Control appeared to be very similar, if not identical to Odyssey ™.

50.     In its January-February 2005 catalogue, K-Line offered products containing a sound effects system called K-Sounds. K-Sounds appears to be virtually identical to Lionel's TrainSounds.

51.     In its January-February 2003 and 2005 catalogues, Lionel K-Line offered a 120 watt transformer.

52.     Cruise Control was virtually identical to Lionel's Odyssey ™ except for the fact that it had a wider range of speed settings. Odyssey ™ operates with 32 "speed steps," K-Line's Cruise Control supported up to 256 different speed steps, which provides for smoother transition from one step to the next another and more precise control of the train speed. This feature is attractive to model train enthusiasts.

53.     K-Line sold the Cruise Control-equipped engines at prices significantly below those of comparable Lionel products. For example, Lionel's model of the K-4 locomotive carried a suggested retail price ("SRP") of $1,049.99 and the SRP for K-Line's comparable K-4 was

$849.95, with similar price disparities in virtually every Cruise Control-equipped engine K-Line has offered. Further, K-Line sold Cruise Control-equipped engines at significant discounts from the established SRP through promotions it labeled "Fall Fair Days", and "February Fair Days" in which it would ship unsold products, including Cruise Control equipped engines, to certain dealers and offer the products at heavily discounted prices to consumers who purchased them during the event.

54. More recently, K-Line has issued a 9-page, close-out price list offering Cruise Control-equipped engines at even greater price reductions.

55. Although Lionel was surprised that K-Line could have come up with such sophisticated technology so quickly and at so low a cost, Lionel had no reason at that time to suspect that K-Line had done so by stealing Lionel's technology.

**Pierson's Files Reveal that He Transferred the Lionel Technology to K-Line**

56. In September 2004 Gerald Calabrese became CEO of Lionel. He began his tenure by putting Lionel's affairs in order and generally streamlining operations. At that time, Pierson worked four and a half days of the week from home. Grubba had permitted Pierson to work from home before Grubba left Lionel. This arrangement became a problem because Pierson had become increasingly unresponsive to Lionel. Thus, in May 2005, Mr. Calabrese decided to terminate Pierson's employment at Lionel.

57. On May 20, 2005, as part of the Company's restructuring, Pierson was terminated and executed his separation agreement ("Separation Agreement"). Among other things, the Separation Agreement acknowledged his obligations under his Non-Disclosure Agreement as follows:

> Upon signing this Agreement, Employee represents that he ... agrees to abide by the enduring terms of [the Nondisclosure and Employment Agreements], including but not limited to, not directly or indirectly disclosing or using at any time, either during or subsequent to Employee's employment, any secret or confidential information, knowledge, or data of

12

> Employer (whether or not obtained, acquired, or developed by Employee) unless he shall first secure the written consent of Employer.

58.     Upon Pierson's termination, Lionel requested that he return the company computers and other hardware that Pierson had been using at home. Pierson resisted. Eventually, Lionel was forced to send its own personnel to Pierson's home to retrieve its property.

59.     Lionel retrieved from Pierson a Gateway laptop, a Sony laptop, an Iomega external hard drive and sundry CDs, floppy disks and DVDs. When Lionel's engineers examined the contents of the recovered material, they discovered that the data from the Iomega external hard drive had been erased by Pierson using a program called the "Evidence Eliminator"; that one of the laptops had crashed, preventing Pierson from running the Evidence Eliminator program on it; and that the other laptop had been reformatted by reinstalling the initial system software.

60.     Lionel sent the two computers and the external hard drive to a forensic data recovery service to see what if anything could be recovered. The service reported that the data that had been erased with Evidence Eliminator might not be fully recoverable. But the data from the two laptops was recovered.

61.     Upon reviewing the recovered files, Lionel discovered that Pierson, at Grubba's request had (i) transferred Lionel's confidential technology to K-Line and (ii) had used Lionel's confidential computer codes to design superior versions of Lionel's technology for K-Line.

62.     E-mails recovered from the computer show that Grubba acted as liaison between K-Line and Pierson.

### *Pierson's Misappropriation of Lionel's Odyssey [TM] Technology for K-Line*

63.     The hardware and software of Odyssey [TM] were implemented in Lionel model trains through a circuit board set known as the DCDRS. As described above, one limitation of

Odyssey $^{TM}$ was that it allowed the user to select from only 32 different speed settings on the Lionel remote control. Lionel had planned that its next generation closed-loop speed control system should have a wider range of speed settings by which the user could more closely fine tune the speed of the model train.

64. As early as 2002, while working for Lionel, Pierson had redesigned Odyssey $^{TM}$ for Lionel so that it could be programmed to provide 64, 128, or 256 different speed settings. The computer files that were recovered from Pierson's computers ("Pierson's Files") indicate that this new speed control system hardware and software was implemented in a circuit board known as the DCDV. The files confirm that the DCDV circuit board was initially created by Pierson for Lionel, which is consistent with Pierson's employment agreement which required him to devote his efforts to Lionel exclusively, and under which Lionel was the exclusive owner of all Pierson work product.

65. Lionel discovered that Pierson's files also contained a different circuit schematic based on the DCDV circuit schematic but which was appears to relate to K-Line. The title block for this circuit schematic bears (i) K-Line's logo, (ii) defendant Klein's initials – "MDK" for Maury D. Klein, (iii) the part number MDK-090, and (iv) K-Line's address at "Chapel Hill NC 27515."

66. The title block for the K-Line DCDV circuit schematic also bears the date September 16, 2003, which indicates that it was created approximately one year after Pierson created the Lionel DCDV circuit board schematic.

67. Other evidence in Pierson's Files shows that Pierson provided Lionel's DCDV software code to K-Line for implementation in its speed control circuit board. Pierson's Files contain a file named "MDK090.C," which contains software code that appears to be a close copy of a revision of Lionel's DCDV software code found in Pierson's Files. Based, among other things, on the fact that the file is labeled "MDK090," the title of the copy of Lionel's DCDV

14

circuit schematic that Mr. Pierson appears to have provided to K-Line (see above), Lionel concluded that Pierson transferred its software codes to K-Line.

68.     Lionel also purchased and dismantled one of K-Line's new locomotives. Upon examining the dismantled locomotive, Lionel's engineers determined that a copy of the Lionel DCDV circuit board is used in K-Line's locomotives.

69.     The software implemented in the DCDV circuit board constituted Lionel's copyrighted information. On July 20, 2005, Lionel filed an expedited application to request its copyright for such software.

### Pierson's Transfer of the TrainSounds Sounds System to K-Line

70.     On March 11, 2003, Pierson created a circuit schematic for Lionel's TrainSounds sound effects systems. The files recovered from Pierson's computer show that on June 19, 2003, Pierson created a substantially similar circuit schematic for K-Line. In addition to bearing the June 19, 2003 date, the title block of the circuit schematic bears the K-Line logo, the K-Line part number MDK-089, the K-Line address in Chapel Hill, North Carolina and the title "KSnds," apparently an abbreviation for "K-Sounds."

71.     Other evidence in Pierson's files points to the same conclusion.

### Pierson's Misappropriation of Lionel's Transformer Technology to Design a Similar Transformer for K-Line While Employed by Lionel.

72.     On or about March 25, 2002, Pierson completed the circuit schematic for Lionel's CW-80 power transformer. The title block of the circuit schematic shows that Pierson as the primary designer, which was consistent with his job responsibilities at Lionel.

73.     The files recovered from Pierson's Lionel computers show that Pierson used Lionel's confidential and proprietary technical information to develop a more powerful 120-watt transformer for K-Line. K-Line is now using that transformer in its boxed starter sets and as a separate sale transformer.

74.     Pierson's Files also contain another circuit schematic virtually identical to Lionel's CW-80 circuit schematic. This circuit schematic, which is dated April 5, 2002, bears the legend "AAGRUB\..\80WATT.SCH".

75.     The circuit schematics dated March 25 (Lionel's) and April 5 (designed by Pierson for K-Line) are nearly identical. In fact, when placed on top of each other over a lighted background, they overlap nearly perfectly. Moreover, both circuit schematics have the same comments and use the same electrical components. For instance, both circuits are based upon the Motorola MC68HC08JK3 microcontroller chip in the center of the pages. Both circuits also use the same transistor part number BTA08-600SW. K-Line's use of this transistor part number on its schematics confirms the misappropriation of the schematic from Lionel, because it turns out that this is an error on Lionel's schematic. Had K-Line actually independently engineered the same features, it is not likely or possible that it would have made the exact same error as found on Lionel's schematics. Lionel actually uses transistor part number BTA08-600CW in its CW-80 power transformer.

76.     Pierson's Files show that Pierson informed Grubba of this error. An e-mail from Pierson to Grubba found in the Pierson Files says:

> Bob,
>
> The following items were corrected on your transformer:
> [Transistors] Q1 and Q2 must be BTA08-600CW -- The CW suffix
> is very important. . . .
>
> –Marty Pierson

**Grubba's Role in the Misappropriation of Lionel's Trade Secrets by K-Line**

77.     A series of e-mails from Grubba to Pierson establish Grubba's role as liaison between K-Line and Pierson. One dated September 21, 2004 reads:

16

> Marty,
>
> How are you coming with my tuning?
>
> I am at K-Line and would like to test the new code on Friday if possible.
>
> Bob

An e-mail dated October 4, 2004 reads:

> Marty,
>
> Can you send the revised motor driver source code?
>
> Bob

An e-mail dated February 2, 2005 reads:

> Can you please send the latest version of the source code for both steam and diesel?
>
> Thanks,
> Bob

As shown by these e-mails, Grubba personally orchestrated and directed the misappropriation of Lionel's technology for the benefit of K-Line.

### *Pierson Confesses to Transferring the Lionel Technology to K-Line*

78. On July 6, 2005, Lionel confronted Pierson with the information it had recovered from his computers. Pierson admitted that Grubba and K-Line had paid him to transfer Lionel's software codes to K-Line and to design new technology for K-Line based on Lionel's proprietary technology. In exchange for Lionel's agreement not to file a civil suit, Pierson provided Lionel with a written statement admitting his involvement in K-Line and Grubba's theft of Lionel trade secrets.

79. Pierson's statement corroborates what Lionel's engineers and Lionel's outside forensic computer consultants discovered by recovering and studying the files that Pierson attempted to delete before returning his computers to Lionel.

80. Pierson admitted that he created the DCDV circuit schematic for Lionel while he was still employed at Lionel. Grubba contacted him in 2002 and asked him if he would design a

closed-loop speed control system for K-Line. Grubba contacted Pierson because he and Klein wanted K-Line's trains to be able to offer the same features as Lionel's, but that Lionel refused to license its technology to K-Line. Grubba and Klein knew that Pierson was subject to various agreements whereby all rights and interests in Pierson's inventions relating to model trains belonged to Lionel. Thus, being unable to license the technology from Lionel, Grubba contacted Pierson and paid him to steal the technology for K-Line's benefit.

81. Indeed, Grubba offered to pay Pierson for his services and warned Pierson not to disclose their arrangement to Lionel. In order to preserve secrecy, Pierson and Grubba communicated with each other using home e-mail accounts.

82. Pierson admits he used Lionel's DCDV circuit schematics (that is, the second generation closed loop speed control system that Lionel had not yet implemented), circuit board artwork, bill of materials, and software and transferred all of this information and technology to K-Line by developing K-Line's closed-loop speed control board. Pierson and Grubba worked closely together on this project. Pierson would contact Grubba regularly by phone and e-mail to discuss the transfer of Lionel's technology to K-Line, and adapting that technology to K-Line's technical specifications. Grubba provided Pierson with samples of K-Line's products so that Pierson could test the modified DCDV circuit board.

83. Grubba paid Pierson to transfer Lionel's proprietary TrainSounds technology to K-Line. Pierson used Lionel's technology to design and develop a sound system for K-Line's trains that was similar to Lionel's TrainSounds system.

84. Grubba further paid Pierson to transfer Lionel's proprietary transformer technology to K-Line, by designing a transformer for K-Line that was based on Lionel's technology. Pierson admitted that he had previously developed a dual output transformer for Lionel known as the CW-80 and that the transformer he developed for K-Line was also a dual output transformer that was based on his proprietary work for Lionel.

85.    Pierson confessed that before he returned the two laptop computers and the external hard drive that he had been using, he attempted to erase all evidence of his work for K-Line by using the Evidence Eliminator program on the Iomega external hard drive and reformatting the hard drive of one of the laptops. Pierson said he could do nothing with the second laptop because it had crashed.

86.    Grubba and K-Line were aware of Pierson's attempt to destroy evidence of their theft of technology. Pierson told Grubba that he had been unable to use "Evidence Eliminator" to wipe clean one of the hard drives because it had crashed. Grubba expressed disappointment that one of the hard drives containing information about the transfer of technology from Lionel to K-Line could not be erased.

### *K-Line Is Marketing Products Containing Lionel's Trade Secrets and Has Issued a Price List Offering Superior Versions of Lionel's Technology at Vastly Reduced Prices in Time for the End-of-Year Holiday Season*

87.    K-Line is currently marketing locomotives containing stolen Lionel technology. K-Line is marketing an Odyssey ™-based program as Cruise Control, TrainSounds as K-Sounds and CW-80 as K-Line's own proprietary 120-watt transformer. K-Line touts these products as the best available.

88.    K-Line sells trains using this stolen technology at prices that Lionel (which paid to develop the technology) cannot match.

89.    Because the technology K-Line is using belongs to Lionel, K-Line is causing Lionel (in effect) compete against its own technology.

90.    K-Line's action threatens Lionel's present customer base, and also its ability to attract new customers to model trains. New customers are much more likely to be drawn to the most inexpensive product on the market.

91.    Each August, well in advance and in anticipation of the end-of-year holiday season, Lionel publishes a catalogue. This year, in advance of the publication of Lionel's

catalogue, K-Line issued a 9-page, close-out price list, which lists its heavily discounted products at prices up to 50% less than comparable Lionel product prices.

92.     K-Line's price list offering heavily discounted trains based on the stolen Lionel technology threatens to sabotage Lionel's holiday sales. Given the quality of K-Line's stolen technology and its bargain basement prices, it may succeed unless enjoined.

93.     The loss of a single season's sales could damage Lionel, particularly given its present Ch 11 status.

94.     In addition, a comparison of K-Line's products and prices with Lionel's will lead Lionel's retailers and customers to believe, albeit wrongly, that Lionel's products are grossly overpriced and that Lionel is guilty of price gouging. Such a perception will cost Lionel dearly in terms of customer and dealer loyalty and goodwill.

95.     The cost to Lionel of losing customer and dealer loyalty and goodwill is incalculable and cannot adequately be compensated for by an award of damages.

**COUNT ONE**
(Misappropriation of Trade Secrets against K-Line, Klein and Grubba)

96.     Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 95, and incorporates them herein by reference.

97.     The technology that Lionel created to implement its Odyssey [TM], TrainSounds and CW-80 are important trade secrets of Lionel.

98.     Lionel did not reveal the Lionel Technology to any individual or entity outside of Lionel, and this technology is not generally known or reasonably ascertainable to those the industry.

99.     Lionel took all reasonable and appropriate measures to guard the secrecy of the Lionel Technology from its competitors.

100. Any unauthorized user of the Lionel Technology would obtain an unfair competitive advantage over Lionel in the market. K-Line is such an unauthorized user.

101. Lionel expended in excess of a million dollars and a great deal of effort in developing the Lionel Technology.

102. K-Line, Klein and Grubba paid Pierson to steal the Lionel Technology for K-Line's benefit after Lionel refused to license the technology.

103. Klein and Grubba directed, authorized, induced, participated in and/or approved the compensation to Pierson to induce him to disclose the Lionel Technology to K-Line.

104. Grubba was acting within the scope of his employment with K-Line when he paid Pierson to steal Lionel's technology for K-Line's benefit.

105. K-Line, Klein and Grubba obtained the Lionel Technology through a breach of the confidential relationship existing between Lionel and Pierson.

106. K-Line, Klein and Grubba obtained the Lionel Technology through a breach of the confidential relationship existing between Lionel and Grubba.

107. K-Line, Klein and Grubba used the misappropriated Lionel Technology to develop products for K-Line.

108. K-Line, Klein and Grubba are selling products that contain the misappropriated Lionel Technology at prices far lower than Lionel's sales prices.

109. K-Line's 9-page, close-out price list will negatively impact Lionel's end-of-year holiday sales.

110. By their actions, K-Line, Klein and Grubba intended and intend to cause K-Line to usurp Lionel's preeminent position in the market.

111. By their actions K-Line, Klein and Grubba have harmed and threaten to harm Lionel's good name.

112. By their actions K-Line, Klein and Grubba have caused and threaten to cause loss of goodwill among Lionel's customers.

113. By their actions K-Line, Klein and Grubba have caused and threaten to cause loss of goodwill among Lionel's dealers.

114. The loss of sales, reputation and good will cause incalculable harm to Lionel.

115. The harm to Lionel from the actions of K-Line Klein and Grubba is actual, imminent, and irreparable.

116. An award of damages will not adequately compensate Lionel for the harm caused by the actions of K-Line, Klein and Grubba.

117. The hardship caused to Lionel if K-Line, Klein and Grubba are not enjoined from using the Lionel Technology is far greater than the hardship caused to K-Line if they are so enjoined.

118. Lionel is entitled to damages in an amount to be determined at trial, to compensate Lionel to the extent possible for the injuries already caused to Lionel by the actions of K-Line, Klein and Grubba.

119. Lionel is entitled to relief enjoining K-Line, Klein and Grubba from using the Lionel Technology in its products.

### COUNT TWO
(Copyright Infringement against K-Line, Klein and Grubba)

120. Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 119, and incorporates them herein by reference.

121. Lionel owns copyrights in the DCDV Rev 3 computer code.

122. On July 20, 2005, Lionel filed an expedited application for Copyright Registration with the United States Copyright Office for the DCDV Rev 3 computer code.

123.    K-Line, Klein and Grubba are using and marketing the DCDV Rev 3 computer code in violation of Lionel's exclusive rights under *inter alia* 17 U.S.C. § 106(1) and (3).

124.    K-Line, Klein and Grubba paid Pierson to disclose the Lionel Technology for the use and benefit of K-Line.

125.    Klein and Grubba directed, authorized, induced, participated in and/or approved paying Pierson to disclose Lionel's source code to K-Line.

126.    Grubba was acting within the scope of his employment with K-Line when he paid Pierson to transfer Lionel's source code to K-Line.

127.    By their actions K-Line, Klein and Grubba are infringing and will continue to infringe Lionel's copyright.

128.    An award of damages will not adequately compensate Lionel for the harm caused by the actions of K-Line, Klein and Grubba.

129.    The hardship caused to Lionel if K-Line, Klein and Grubba are not enjoined from infringing Lionel's copyright is far greater than the hardship caused to K-Line if it is so enjoined.

130.    Lionel is entitled to damages in an amount to be determined at trial, to compensate Lionel to the extent possible for the injuries already caused to Lionel by the actions of K-Line, Klein and Grubba.

131.    Lionel is entitled to relief enjoining K-Line, Klein and Grubba from using and marketing the DCDV Rev 3 computer code.

### COUNT THREE
(Breach of Contract against Grubba)

132.    Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 131, and incorporates them herein by reference.

133.    The Nondisclosure Agreement between Grubba and Lionel ("Grubba's Nondisclosure Agreement) is a valid and binding contract.

134. Grubba's Nondisclosure Agreement states in pertinent part as follows:

> Employee shall not directly or indirectly disclose or use at any time either during or subsequent to the said employment any secret or confidential information, knowledge or data of Employer (whether or not obtained, acquired or developed by Employee) unless he shall first secure the written consent of Employer.

135. By the terms of Grubba's Nondisclosure Agreement, Grubba was bound to preserve the confidentiality of the Lionel Technology, even when no longer employed by Lionel.

136. Grubba disclosed the Lionel Technology to K-Line.

137. By disclosing the Lionel Technology to K-Line, Grubba breached his Nondisclosure Agreement.

138. Lionel is entitled to damages in an amount to be determined at trial.

### COUNT FOUR
(Breach of Contract against Grubba)

139. Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 138, and incorporates them herein by reference.

140. The Consultancy Agreement between Grubba and Lionel ("Grubba's Consultancy Agreement) is a valid and binding contract.

141. Grubba's Consultancy Agreement states in pertinent part as follows:

> The Consultant agrees that he will not at any time (whether during the Term or after termination of this Agreement), disclose to anyone any confidential information or trade secret of the Company . . . or utilize such confidential information or trade secret for his own benefit, or for the benefit of third parties.

142. By the terms of Grubba's Consultancy Agreement, Grubba agreed not to disclose the Lionel Technology to anyone.

143. By the terms of Grubba's Consultancy Agreement, Grubba agreed not to utilize the Lionel Technology for the benefit of third parties.

24

144. By the terms of Grubba's Consultancy Agreement, Grubba was bound to preserve the confidentiality of the Lionel Technology both during and after the term of his consultancy.

145. During the term of his consultancy, Grubba disclosed the Lionel Technology to K-Line.

146. During the term of his consultancy, Grubba utilized the Lionel Technology for the benefit of K-Line.

147. By disclosing the Lionel Technology to K-Line, Grubba breached his Consultancy Agreement.

148. By utilizing the Lionel Technology for the benefit of K-Line, Grubba breached his Consultancy Agreement.

149. Lionel is entitled to damages in an amount to be determined at trial.

### COUNT FIVE
(Tortious Interference with Contractual Relations against K-Line and Klein)

150. Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 149, and incorporates them herein by reference.

151. K-Line and Klein wished to use the Lionel Technology in K-Line's products.

152. Lionel refused to license the Lionel Technology to K-Line.

153. K-Line and Klein knew or had reason to know that Grubba was employed by Lionel as Director of Engineering previous to his employment with K-Line.

154. K-Line and Klein knew or had reason to know that as Director of Engineering, Grubba would have been privy to the Lionel Technology.

155. K-Line and Klein knew or had reason to know that as an employee privy to confidential information, Grubba was under a contractual obligation not to disclose the Lionel Technology to K-Line.

156.     Under Grubba's Nondisclosure Agreement, Grubba is under a contractual obligation not to disclose the Lionel Technology to K-Line.

157.     K-Line and Klein intentionally and improperly induced Grubba to disclose the Lionel Technology to K-Line.

158.     Grubba disclosed the Lionel Technology to K-Line.

159.     Grubba's disclosure of the Lionel Technology to K-Line caused pecuniary loss to Lionel.

160.     Lionel is entitled to damages to compensate it for the pecuniary loss suffered by Grubba's disclosure of the Lionel Technology to K-Line.

### COUNT SIX
(Tortious Interference with Contractual Relations against K-Line and Klein)

161.     Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 160, and incorporates them herein by reference.

162.     K-Line and Klein wished to use the Lionel Technology in K-Line's products.

163.     Lionel refused to license the Lionel Technology to K-Line.

164.     K-Line and Klein knew or had reason to know that Grubba was retained as a consultant to Lionel from 2001-2004, during the period when he was also an employee of K-Line.

165.     K-Line and Klein knew or had reason to know that Grubba was privy to the Lionel Technology.

166.     K-Line and Klein knew or had reason to know that Grubba was under a contractual obligation not to disclose the Lionel Technology to K-Line.

167.     Under Grubba's Consultancy Agreement, Grubba is under a contractual obligation not to disclose the confidential information to K-Line.

168. K-Line and Klein intentionally and improperly induced Grubba to disclose the Lionel Technology to K-Line.

169. Grubba disclosed the Lionel Technology to K-Line.

170. Grubba's disclosure of the Lionel Technology to K-Line caused pecuniary loss to Lionel.

171. Lionel is entitled to damages to compensate it for the pecuniary loss suffered by Grubba's disclosure of the Lionel Technology to K-Line.

### COUNT SEVEN
(Tortious Interference with Contractual Relations against K-Line, Klein and Grubba)

172. Lionel repeats and realleges the allegations contained in paragraphs 1 through 171, above.

173. K-Line, Klein and Grubba wished to obtain the Lionel Technology for K-Line.

174. Lionel refused to license the Lionel Technology to K-Line.

175. Grubba knew that Pierson was currently employed by Lionel.

176. As Pierson's former supervisor, Grubba knew that Pierson had access to the Lionel Technology.

177. K-Line and Klein knew or had reason to know that Pierson was an employee of Lionel, who had access to the Lionel Technology.

178. As Pierson's former supervisor, Grubba knew that Pierson had the ability to modify the Lionel Technology to suit K-Line's specific needs.

179. K-Line and Klein knew or had reason to know that Pierson had the ability to modify the Lionel Technology to suit K-Line's specific needs.

180. As a former executive at Lionel, Grubba knew that Pierson was under a contractual obligation (i) not to disclose the Lionel Technology to K-Line, (ii) not to work for K-

27

Line while he was still employed by Lionel, and (iii) to assign to Lionel any discoveries or inventions that he came up with that related to Lionel's business.

181. K-Line and Klein knew or had reason to know that Pierson was under a contractual obligation (i) not to disclose the Lionel Technology to K-Line, (ii) not to work for K-Line while he was still employed by Lionel, and (iii) to assign to Lionel any discoveries or inventions that he came up with that related to Lionel's business.

182. K-Line, Klein and Grubba intentionally and improperly paid Pierson to disclose the Lionel Technology to K-Line.

183. K-Line, Klein and Grubba intentionally and improperly paid Pierson to modify the Lionel Technology to K-Line's specific needs.

184. Pierson disclosed the Lionel Technology to K-Line.

185. Pierson modified the Lionel Technology to K-Line's specific needs.

186. Pierson's disclosure of the Lionel Technology to K-Line and his modification of the Lionel Technology to K-Line's specific needs caused pecuniary loss to Lionel.

187. Lionel is entitled to damages to compensate it for the pecuniary loss suffered by Pierson's disclosure of the Lionel Technology to K-Line and modification of the Lionel Technology to K-Line's specific needs.

## COUNT EIGHT

(Conspiracy By K-Line, Klein, Grubba With Pierson)

188. Lionel repeats and realleges each and every allegation set forth in paragraphs 1 through 187, and incorporates them herein by reference.

189. K-Line, Klein, Grubba and Pierson entered into a common plan and scheme to misappropriate Lionel's trade secrets.

190.     K-Line and Klein asked Grubba, a K-Line employee, to contact Pierson and bribe him to disclose Lionel's trade secret technology and modify it thereof to develop competing K-Line products.

191.     Grubba contacted Pierson and asked him to disclose Lionel's trade secrets and modify it thereof to develop competing K-Line products in return for monetary compensation.

192.     K-Line, Klein and Grubba paid Pierson to steal the Lionel Technology for K-Line's benefit.

193.     Pierson disclosed Lionel's trade secrets to Grubba for K-Line's benefit in return for monetary compensation.

194.     Pierson and Grubba worked together with K-Line and Klein to modify Lionel's trade secret technology to meet K-Line's specific needs in return for monetary compensation.

195.     K-Line, Klein, Grubba and Pierson knew that using Lionel's trade secret technology to develop, market and sell competing K-line's products would benefit K-Line but damage Lionel's business.

196.     Nevertheless, K-Line, Klein, Grubba and Pierson misappropriated Lionel's trade secrets to develop, market and sell competing K-Line products at cheaper prices, for the benefit of K-Line and themselves and to beat Lionel to the market before Lionel had a chance to release the improved technology itself.

197.     As a result of the misappropriation of Lionel's trade secrets and their use by K-Line, Lionel's business has suffered serious harm, including loss of market share, customers, goodwill and reputation.

### PRAYER FOR RELIEF

WHEREFORE Lionel respectfully requests that this Court enter judgment as follows:

(a) On Count One: (i)  an order adjudging Defendants to have misappropriated Lionel's trade secrets; (ii) a permanent injunction enjoining Defendants, their agents, servants, employees,

attorneys, successors and assigns, and all persons, firms and corporations acting in concert with K-Line, from manufacturing, distributing, marketing, advertising, promoting, soliciting, accepting orders for, shipping, selling or offering for sale the products incorporating, or derived or copied from Lionel's trade secrets and from participating or assisting in any such activity; and (iii) products damages in an amount to be determined at trial and pre-judgment interest thereon;

(b) On Count Two: (i) An order adjudging Defendants to have infringed Lionel's copyrights in the DCDV Rev 3 computer code; (ii) a permanent injunction enjoining Defendants, their agents, servants, employees, attorneys, successors and assigns, and all persons, firms and corporations acting in concert with K-Line, from directly or indirectly infringing Lionel's copyrights, including but not limited to continuing to manufacture, distribute, market, advertise, promote, solicit or accept orders for, ship, sell or offer for sale products incorporating, or derived or copied from Lionel's copyrighted materials and from participating or assisting in any such activity; and (iii) damages in an amount to be determined at trial and pre-judgment interest thereon;

(c) On Counts One and Two: recall of products using the stolen technology that may have been shipped or are about to be shipped to distributors and stores and that have not yet been sold to consumers;

(d) On Counts Three to Seven: Damages in an amount to be determined at trial and pre-judgment interest thereon;

(e) On Count Eight: Damages in an amount to be determined at trial for compensatory damages and pre-judgment interest thereon;

(f) Exemplary and punitive damages, in an amount to be determined at trial, and

(g) Such other and further relief as this Court deems just and proper.

New York, New York.
July 26, 2005

Respectfully submitted,

By: _____
Adam C. Harris (AH 4641)
Dale M. Cendali (DC 2676)
O'MELVENY & MYERS LLP
Times Square Tower
7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

*Attorneys for Plaintiff Lionel L.L.C.*